UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| DOROTHY WESSELS, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>BANK OF AMERICA, NA, et al.,<br><br>    Defendants. | Case No. 16-cv-03478-LB<br><br>**ORDER**<br><br>Re: ECF No. 8 |

**INTRODUCTION**

This dispute concerns the modification of a residential-mortgage loan. In 2013, Ocwen Loan Servicing approved a trial plan that required Plaintiffs Dorothy and Guenther Wessels to make three monthly payments, and then the loan modification would be permanent. The plaintiffs made the three payments and all monthly payments thereafter. They now challenge the failure of the successor servicers — Defendants Bank of America ("BOA") and BSI Services — to permanently modify the loan. They assert claims of breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing, negligence, intentional and negligent misrepresentation, violations of California Civil Code §§ 2924.11 and 2923.7, a violation of California Business and Professions Code § 17200, and declaratory relief based on an allegedly

improper securitization of the mortgage.[1]

The defendants BSI (the loan servicer from November 1, 2014 to February 1, 2015) and Venture Trust (the loan beneficiary under an assignment of deed of trust) move to dismiss all claims.[2] Their main argument is that they are not liable for failing to provide a loan modification because the trial plan obligated the plaintiffs to make their three trial payments on the first of the month, and the plaintiffs made their payments in the middle of the month.[3] The plaintiffs respond that Ocwen told them that they could make the payments then because that is when they received their social-security checks.[4] (The plaintiffs are spouses, and the complaint reveals that in July 2015, they were 73 and 83 years old, respectively.[5])

The parties have consented to magistrate jurisdiction.[6] This motion can be decided without oral argument. *See* Civil L.R. 7-1(b). The court grants in part and denies in part the motion to dismiss. The court dismisses the claims for intentional and negligent misrepresentation, the § 2923.7 violation against Venture Trust, the § 17200 claim (to the extent that it is predicated on fraud), and the claim for declaratory relief. The court otherwise denies the defendants' motion to dismiss. The dismissals are without prejudice except for the securitization claim, which the court decides as a matter of law.

## STATEMENT

The plaintiffs are Dorothy and Guenther Wessels, and their home is in Lafayette, California.[7] The three loan servicers are Ocwen (serviced the loan from 2012 to March 18, 2013), BOA (serviced the loan from March 18, 2013 to November 1, 2014), and BSI (serviced the loan from November 1, 2014 to February 1, 2016).[8]

---

[1] Complaint — ECF No. 1-1. Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Motion — ECF No. 8.

[3] *Id.* at 11.

[4] Opposition — ECF No. 16 at 9; Complaint — ECF No. 1-1, ¶ 20.

[5] Complaint — ECF No. 1-1, ¶ 132.

[6] ECF Nos. 13, 14, 32.

[7] Complaint — ECF No. 1-1, ¶ 1,

[8] *Id.* ¶¶ 6-8.

In 2012, the Wessels applied for a loan modification.[9] On February 15, 2013, Ocwen sent the Wessels a written "trial plan" to modify the loan; the agreement is Exhibit A to the complaint.[10] It provided that if the plaintiffs made three trial payments of $2,879.188 on March 1, April 1, and May 1, then Ocwen would permanently modify the loan.[11] The trial plan said, "All you need to do to accept this offer is make your first Trial Period Payment. We already have the documentation we require on file."[12] The trial plan said, "We want to help you stay in your home and avoid foreclosure," and it also outlined the terms of the permanent modification.[13] The permanent loan modification involved waiving all late fees, reducing the principal balance from $1,323,100.96 to $709,996.50, reducing the monthly loan payments from $4,714.45 to $2,879.18, and reducing the interest rate from 7.63% to 2.00% (APR).[14]

Two days later, the plaintiffs called Ocwen, spoke to Brian Rollins, and said they wanted and agreed to the terms of the modification.[15] "Brian Rollins stated to Plaintiffs that as long as payment was made within the month of the due date, the payment would be considered as timely and in compliance with the . . . agreement."[16] The plaintiffs "informed Brian Rollins that they would make the payments around the 12th of every month to coincide with receipt of their Social Security benefits which he stated was acceptable."[17] During the call, Brian Rollins told the plaintiffs "again to 'always make sure the payments are made *prior to the end of the month*.'"[18]

The plaintiffs made their first trial payment on March 15, 2013, and it cleared on March 19.[19]

---

[9] *Id.* ¶ 17.

[10] *Id.* ¶ 18 & Ex. A — ECF No.1-1 at 67-72.

[11] Complaint — ECF No. 1-1, ¶ 19.

[12] Complaint, Ex. A — ECF No. 1-1 at 67.

[13] *Id.*

[14] *Id.*

[15] Complaint — ECF No. 1-1, ¶ 20.

[16] *Id.*

[17] *Id.*

[18] *Id.* (emphasis in the original).

[19] *Id.* ¶ 22.

1     Around March 17, the plaintiffs received notice that BOA was the new loan servicer.[20] On
2  March 28, BOA sent them an escrow account review with an "amount due" for April 2013 of
3  $4,597.28.[21] That day, Mrs. Wessels called customer service, tried to make a payment for April
4  2013, and was told by a BOA representative that she must speak with her BOA case manager
5  Michael Colburn to make payments.[22] When she did not hear back from Mr. Colburn, she called
6  him on April 3 and left a message about making her payment; she also left a message with his
7  supervisor Ben Diaz.[23] Later that day, Mr. Colburn asked the Wessels for a copy of the trial plan,
8  proof of the first payment, and "a third party authorization"; the plaintiffs faxed all documents.[24]
9  On April 4, Mr. Colburn called Mrs. Wessels to "accept the second [trial] payment."[25] Mrs.
10 Wessels was upset because he took so long to contact her, and she was afraid the payment would
11 be late, but "Mr. Colburn reassured [her] that so long as the payment was made prior to the end of
12 the month, the payment was timely."[26] Mrs. Wessels asked if she could make the payment at a
13 local BOA branch, but Mr. Colburn said that during the trial period, she must pay him directly
14 because a branch was not equipped to accept trial payments.[27] He said that the plaintiffs could set
15 up automatic payments in June 2013 after they made the final trial payment in May 2013.[28] The
16 Wessels then made the second payment on April 4, and it cleared on April 9.[29]

   On April 9, BOA sent the Wessels a letter noting the availability of "a loan modification, short
17 sale or deed in lieu of foreclosure" if they were "finding it difficult to make [their] monthly
18 mortgage payments."[30] Confused and upset, Mrs. Wessels immediately called Mr. Colburn, who

---

[20] *Id.* ¶ 23.
[21] *Id.* ¶ 25 & Ex. D — ECF No. 1-1 at 74-75.
[22] Complaint — ECF No. 1-1, ¶ 26.
[23] *Id.* ¶¶ 27-28.
[24] *Id.* ¶ 29.
[25] *Id.* ¶ 30.
[26] *Id.*
[27] *Id.* ¶ 31.
[28] *Id.*
[29] *Id.* ¶ 32.
[30] *Id.* ¶ 33 & Ex. E — ECF No. 1-1 at 87-88.

ORDER — No. 16-cv-03478-LB          4

said to "ignore" the letter and that was "automatically" generated.[31] On April 13, BOA sent another letter, stating that it recently sent "a letter [to the plaintiffs] that you were no longer being considered for a modification because you did not provide us the requested documentation" and offering another opportunity to apply for a loan modification, short sale, or deed in lieu of foreclosure.[32] Alarmed, Mrs. Wessels left multiple telephone messages for Mr. Colburn on April 13.[33] On April 23, BOA sent a letter saying that the plaintiffs' April 2013 payment of $2,879.18 was insufficient and would be applied to the $4,714.45 due for April.[34] Mrs. Wessels called Mr. Colburn, who told her not to worry about the letter and the demand for a higher payment, asked for a faxed copy of the letter, and said he "would take care of it."[35] Mrs. Wessels faxed the letter.[36]

On May 15, 2013, the plaintiffs made their third and final trial payment of $2,879.18 to Mr. Colburn; it cleared that day.[37]

On June 15, 2013, BOA sent the plaintiffs a letter that their loan was ineligible for modification because the trial payments were untimely.[38] BOA locked the account, which meant the Wessels could not make their June payment.[39] On June 15, Mrs. Wessels called Mr. Colburn, who said that the letter was a mistake, she should continue to make payments, and she would receive the permanent loan modification in July or August 2013 because the department was backlogged.[40] On June 16, Mrs. Wessels learned from her bank that Mr. Colburn had not set up automatic payments; when she asked Mr. Colburn, he said that automatic payments "could not be accepted at this time, but he would get the issue resolved, and again assured her that because all

---

[31] *Id.* ¶ 34.

[32] *Id.* ¶ 35 & Ex. F — ECF No. 1-1 at 92-93.

[33] *Id.* ¶ 36.

[34] *Id.* ¶ 37.

[35] *Id.*

[36] *Id.* & Ex. G — ECF No. 1-1 at 100-01.

[37] *Id.* ¶ 38.

[38] *Id.* ¶ 40 & Ex. H — ECF No. 101-1 at 103-04.

[39] *Id.* ¶ 41.

[40] *Id.* ¶ 42.

ORDER — No. 16-cv-03478-LB           5

1   the [trial] payments were made, she would obtain a permanent loan modification sometime in

2   August or September 2013.[41]

3   On July 5, 2013, Mrs. Wessels faxed Mr. Colburn a letter about when she would receive the

4   written permanent modification.[42] That same day, the California Monitor (a program of the

5   California Attorney General) sent a letter that said, "I am writing to you, along with Bank of

6   America, to let you know that you meet the basic eligibility criteria to apply for a principal

7   reduction modification on your home loan" and advising them to get in touch with the Bank of

8   America."[43] On July 8, Mr. Colburn called Mrs. Wessels and said that he had "'straightened out'

9   everything and they would accept future modified permanent loan payments of $2,879.18."[44]

10   Mrs. Wessels made her July payment on July 8, and it cleared.[45] On August 1, Mrs. Wessels

11   faxed Mr. Colburn a letter that the account was locked again; Mr. Colburn's supervisor unlocked it

12   on August 3, and the check cleared on August 12.[46]

13   BOA sent a past due notice on August 12.[47] On September 3, Mrs. Wessels spoke with Mr.

14   Colburn, who said that the loan modification would be sent by October 2013.[48] On September 12,

15   Mrs. Wessels called the BOA servicer to make a payment, and it cleared that day.[49] Regina

16   Ellerson then took over from Mr. Colburn as the plaintiffs' BOA case manager.[50] On September

17   27, Mrs. Wessels asked Ms. Ellerson about the status of the loan modification; Ms. Ellerson asked

18   for a copy of the Ocwen documents, and Mrs. Wessels faxed them to her.[51]

---

[41] *Id.* ¶¶ 43-45.

[42] *Id.* ¶ 46.

[43] *Id.* ¶ 47 & Ex. J — ECF No. 1-1 at 111.

[44] Complaint — ECF No. 1-1, ¶ 48.

[45] *Id.* ¶ 49 (has July 8 and July 7 as dates).

[46] *Id.* ¶¶ 50-51 & Ex. K — ECF No. 1-1 at 123.

[47] *Id.* ¶ 52 & Ex. L — ECF No. 1-1 at 126-27.

[48] *Id.* ¶ 53.

[49] *Id.* ¶ 54.

[50] *Id.* ¶ 55.

[51] *Id.* ¶ 56 & Ex. M — ECF No. 1-1 at 131.

1    On September 27, 2013, Mrs. Wessels tried to make her October payment; the account was

2 blocked. That day, she called BOA servicer Candace Brice, who unblocked the account, and the

3 payment cleared immediately.[52]

4    The pattern repeated in October: past due letter, blocked account, call to unblock the account,

5 payment accepted and credited.[53] Mrs. Wessels left messages numerous times in October for Ms.

6 Ellerson and another servicer named Nicole. On October 29, Ms. Ellerson told the plaintiffs that

7 BOA had denied the loan modification, said she would call back the next week with more

8 information, and never called.[54]

9    On November 7, 2013, the plaintiffs were assigned to a new case manager, Valerie Brite, who

10 told them that there was no permanent modification and they must start over.[55] On November 13,

11 Ms. Brite agreed to research the matter but would not allow monthly payments; "[a]fter a lengthy

12 dialogue, Plaintiffs' account was temporarily unlocked to accept a payment," which was accepted

13 and credited on November 14.[56] Mrs. Wessels left numerous messages for Ms. Brite. On

14 December 12, Ms. Brite responded that she was still researching the issue and asked for copies of

15 the trial plan and proof of payment. Mrs. Wessels faxed them.[57]

16   BOA blocked the account again in December, and Mrs. Wessels called Ms. Brite, who said she

17 would check with her supervisor about accepting payment. The case was reassigned to case

18 manager Natalie Arneaud, and BOA accepted the December modified loan payment of

19 $2,879.18.[58] BOA accepted the January payment.[59] On January 16, 2014, BOA sent a letter

20 referring the house for foreclosure.[60] Mrs. Wessels left an urgent voice mail for Ms. Arneaud, but

---

[52] Complaint — ECF No. 1-1, ¶¶ 57-58.

[53] *Id.* ¶¶ 59-63.

[54] *Id.* ¶¶ 64-66.

[55] *Id.* ¶¶ 67-68.

[56] *Id.* ¶¶ 70-71.

[57] *Id.* ¶¶ 72-73 & Ex. N — ECF No. 1-1 at 136-47.

[58] Complaint — ECF No. 1-1, ¶¶ 74-6.

[59] *Id.* ¶ 80.

[60] *Id.* ¶ 82.

1  her voicemail said that she was out until January 30. On February 3, 2014, Ms. Arneaud called

2  back and said that she was meeting with her supervisor and research team to go over the loan

3  modification and unblock the account. BOA then accepted the February 2014 loan payment on

4  February 4.[61]

5  The plaintiffs then hired an attorney, who wrote a demand letter to BOA to honor the terms of

6  the trial plan.[62] The plaintiffs were assigned to a new case manager, Clarence Brice; on March 4,

7  BOA sent a letter that "the loan was approved for a trial plan, with payments of $2,879.18 from

8  March 1, 2013 to May 1, 2013, by the previous servicer, OCWEN. **All trial payments were**

9  **successfully completed by the customer**. . . . It is important for the **customer to continue**

10  **making the *trial payment amount*** until conversion of the account and the related permanent

11  modification is completed."[63]

12  BOA accepted the monthly modified loan payments of $2,879.18 in March, April, May, and

13  June 2014.[64] On June 24, BOA sent a letter saying, "**a permanent modification will be honored**

14  **by OCWEN Mortgage Servicer (OMS). This loan will be transferred back to OMS and**

15  **updated to match the terms of the agreement. Please allow 60 days for this change to take**

16  **place.**"[65] BOA told the plaintiffs on July 8 that it was holding the file for two or three months,

17  then it would be transferred to Ocwen, and then the permanent loan-modification documents

18  would issue. BOA also told the plaintiffs to keep making the trial payments.[66]

19  BOA accepted the July through October 2014 payments. Throughout this period, BOA kept

20  sending notices that the loans were in arrears, recorded a notice of default, and notified the

21  plaintiffs that they had begun the foreclosure process.[67] In August, BOA assigned the plaintiffs a

---

[61] *Id.* ¶¶ 83-85.

[62] *Id.* ¶ 88 (referencing Ex. P).

[63] *Id.* ¶¶ 89-90 (emphasis in complaint).

[64] *Id.* ¶¶ 91-94.

[65] *Id.* ¶ 95 (emphasis in complaint) (referencing Ex. R).

[66] *Id.* ¶ 96 (referencing Ex. S).

[67] *Id.* ¶¶ 97-104, 106.

United States District Court
Northern District of California

new case manager named William May, who said that he did not have documents or information about the loan modification; the plaintiffs then faxed him all documents.[68]

On October 14, 2014, BOA notified the plaintiffs that it was transferring the servicing of the mortgage to BSI as of November 1, 2014.[69] On November 5, Hanny Hassan at BSI informed the plaintiffs that the permanent modification would "eventually get honored, it has to get honored," and that BOA was working with BSI to service it.[70] On November 19, 2014, BSI sent them a welcome letter "followed by an email dated November 24, 2014 from BSI case manager Jacqueline Wyndham informing Plaintiffs that 'a conversion to a permanent modification may take longer than usual. **BSI will honor the BOA trial.**' In the meantime, Plaintiffs were encouraged to continue making the ongoing monthly payments."[71] BSI told the plaintiffs to mail their monthly payments; they did, and BSI accepted payments thereafter starting in November 2014 through April 2016.[72] (The complaint is dated May 2, 2016.[73])

Many things happened during this period.

BSI returned the November 2014 payment on the ground that the loan was in foreclosure.[74] But Ms. Wyndham (from BSI) told the plaintiffs on December 29, 2014 that (1) it was taking longer than expected to finalize the permanent loan modification, (2) BSI would honor the loan modification, and (3) they should keep making payments.[75]

On January 13, 2015, BSI sent a letter that it would no longer pay insurance premiums. The loan payments under the trial plan included insurance and taxes.[76] In response to the plaintiffs' counsel's email on January 26, 2015 about the status of the permanent modification, Ms.

---

[68] *Id.* ¶ 99 .

[69] *Id.* ¶ 105.

[70] *Id.* ¶ 108 (referencing Ex. T).

[71] *Id.* ¶ 109 (referencing Ex. U) (emphasis in complaint).

[72] *Id.* ¶¶ 110, 112, 116, 119-21, 124, 128, 135-36, 139, 141-42, 144, 146, 163, 166.

[73] *Id.* at 65.

[74] *Id.* ¶ 113.

[75] *Id.* ¶ 114 (citing Ex. V).

[76] *Id.* ¶ 115.

1   Wyndham responded that the "underwriters are a little backed up" and the plaintiffs "should

2   'continue making trial payments.'"[77] In April 2015 and May 2015, Farmers Insurance notified the

3   plaintiffs that the homeowners' insurance premium (billed to BSI) had not been paid, which meant

4   that by May, the insurance lapsed and needed a payment to reinstate the policy. Farmers notified

5   BSI.[78] Mrs. Wessels telephoned and emailed with Farmers and BSI, reminding BSI on that she

6   was 73 and her spouse was 83, and they were becoming physically ill from the delay.[79]

7   In July 2015, BSI notified the plaintiffs that it would increase their loan payment to $4,962.12

8   beginning on August 1.[80] Mrs. Wessels left telephone messages and emails through September

9   about her monthly payments, the insurance lapse, and the permanent modification.[81] On

10  September 21, 2015, BSI assigned a new single point of contact named Steven Smith, who said he

11  would investigate the modification but never communicated again with the plaintiffs.[82] On

12  December 8, 2015, BSI assigned a new single point of contact named Scott Meyers.[83] Mrs.

13  Wessels told him the history of the modification.[84] BSI assigned a new single point of contact

14  named Andy Downs.[85] Then, the loan was transferred back to BOA as of February 1, 2016.[86]

15  On February 4, 2016, BOA sent the plaintiffs a payment coupon reflecting that nothing was

16  due for February 2016.[87] On February 8, 2016, a BOA servicer named Taylenn called the

17  plaintiffs, identifying herself as a debt collector attempting to collect on the loan.[88] On February

18  11, Gloria from BOA called and told the plaintiffs that the property was in foreclosure, but no sale

---

[77] *Id.* ¶¶ 117-18 (referencing Ex. W).
[78] *Id.* ¶¶ 122-23 (referencing Ex. X).
[79] *Id.* ¶¶ 126-32.
[80] *Id.* ¶ 133.
[81] *Id.* ¶¶ 134-39.
[82] *Id.* ¶ 140.
[83] *Id.* ¶ 143.
[84] *Id.*
[85] *Id.* ¶ 147.
[86] *Id. ¶¶* 145, 148.
[87] *Id.* ¶ 149.
[88] *Id.* ¶ 150.

1  date was set.[89] Mrs. Wessels told both about the permanent loan modification.[90] Gloria transferred

2  Mrs. Wessels to Vaughn Nickerson, and at his request, Mrs. Wessels faxed him a third-party

3  authorization.[91] BOA initially rejected the February payment because the loan was in foreclosure

4  and told Mrs. Wessels — through many calls transferred to various servicers — that her loan was

5  inactive and not in any modification review.[92]

6  Zillow lists the property as "pre-foreclosure," and strangers come up to the property to ask

7  about the sale, walk around (without invitation), and otherwise react to the sale.[93]

8  The plaintiffs filed their complaint in state court in May 2015, and the defendants removed the

9  case and then filed a motion to dismiss for failure to state a claim.[94]

## ANALYSIS

Federal Rule of Civil Procedure 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation and citation omitted).

A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face. *See id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting

---

[89] *Id.* ¶ 151.
[90] *Id.* ¶¶ 150, 152.
[91] *Id.* ¶ 153.
[92] *Id.* ¶¶ 159-63.
[93] *Id.* ¶¶ 164-65.
[94] Notice of Removal — ECF No. 1; Motion — ECF No. 8.

ORDER — No. 16-cv-03478-LB       11

*Twombly*, 550 U.S. at 557.). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555 (internal citations and parentheticals omitted).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *See id*. at 550; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007). If the court dismisses a complaint, it must give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Col. Serv. Inc.*, 911 F.3d 242, 247 (9th Cir. 1990).

The defendants' challenges to the complaint can be separated into several categories: the contract claims, negligence, intentional and negligent misrepresentation, claims under California statutes, intentional infliction of emotional distress, and declaratory relief.

**1. Contract Claims**

To state a claim for breach of contract, a plaintiff must show the following: (1) a contract existed; (2) the plaintiff performed his duties or was excused from performing his duties under the contract; (3) the defendant breached the contract; and (4) the plaintiff suffered damages as a result of that breach. *See First Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001). "Facts alleging a breach, like all essential elements of a breach of contract cause of action, must be pleaded with specificity." *See Levy v. State Farm Mut. Auto. Ins. Co.*, 150 Cal. App. 4th 1, 5 (2007).

The defendants contend that the contract never materialized because it was a contingent offer that depended on the plaintiffs' making the three trial payments on the first of the month (March 1, April 1, and May 1, 2013). Because the plaintiffs did not make their payments on time, there was

1  no enforceable obligation for a permanent modification.[95] To the extent that the plaintiffs rely on
2  any representations by the servicers that mid-month payments satisfied the plaintiffs' obligations,
3  those promises cannot alter the contract because the statute of frauds requires all modifications to
4  be in writing.[96] The plaintiffs respond that the servicers confirmed in writing that the payments
5  satisfied the trial plan, the defendants in any event waived any right to stand on a first-of-the-
6  month payment, and their performance and the defendants' acceptance of the payments created an
7  enforceable obligation.[97]

    The plaintiffs plausibly plead a contract claim. First, the plaintiffs point to documentary
evidence that payment within a month satisfied the parties' agreement for the trial period. At the
pleadings stage, this is sufficient and gives plausible notice of the claim.  Second, whether it is
couched as waiver or otherwise, the plaintiffs have pleaded promissory estoppel.

    Under California law, "[a] promise which the promisor should reasonably expect to induce
action or forbearance on the part of the promisee or a third person and which does induce such
action or forbearance is binding if injustice can be avoided only by enforcement of the promise."
*See Kajima/Ray Wilson v. Los Angeles Cnty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 310 (2000).
Promissory estoppel is an equitable doctrine whose remedy may be limited "as justice so
requires." *See id.*  The elements of promissory estoppel are: "(1) a clear promise; (2) reasonable
and foreseeable reliance by the party to whom the promise is made; (3) injury (meaning,
substantial detriment); and (4) damages 'measured by the extent of the obligation assumed and not
performed.'" *See Errico v. Pacific Capital Bank, N.A.*, 753 F. Supp. 2d 1034, 1048 (N.D. Cal.
2010) (citing and quoting *Poway Royal Mobilehome Owners Ass'n. v. City of Poway*, 149 Cal.
App. 4th 1460, 1470 (2007)).

    Here, the plaintiffs alleged sufficiently a clear promise, reliance on the promise, injury, and
damages. If proven, the promise is enforceable notwithstanding the statute of frauds. *See Munoz v.*

---

[95] Motion — ECF No. 8 at 17.
[96] *Id.* at 17-18.
[97] Opposition — ECF No. 16 at 8-12.

1  *Kaiser Steel Corp.*, 156 Cal. App. 3d 965, 974 (1984). At the pleadings stage, courts do not

2  dismiss promissory estoppel claims on statute-of-frauds grounds when the plaintiff adequately

3  pleads promissory estoppel. *See Rijhwani v. Wells Fargo Home Mortg., Inc.*, No. C 13-05881 LB,

4  2014 WL 890016, at * 13 (N.D. Cal. Mar. 3, 2014) (collecting cases). The defendants' subsequent

5  disavowal of the promise does not mean that the plaintiffs did not plead the promises (in the form

6  of the trial plan and permanent modification) sufficiently. Moreover, the plaintiffs relied on the

7  promises and continued to make payments from 2013 through 2016, and they pleaded that the

8  defendants told them to do so because the loan would be modified permanently. The plaintiffs also

9  did more than make payments; they submitted all documents, responded to communications about

10 default, and otherwise did all that they could to secure the (allegedly) promised modification and

11 to avoid foreclosure. In sum, they plausibly pleaded a connection between the promises and their

12 reasonable and detrimental reliance on them. *See id.* at *11-12 (collecting and discussing cases).

13 The court also denies the defendants' motion to dismiss the claim for a breach of the implied

14 covenant of good faith and fair dealing because the court finds that the plaintiffs pleaded the

15 contract claim plausibly.

**2. Negligence**

The plaintiffs claim that the defendants negligently handled their loan modification.[98]

The elements of a negligence claim are (1) the existence of a duty to exercise due care, (2) breach of that duty, (3) causation, and (4) damages. *See Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 500 (2001). Under California law, financial institutions generally do not owe borrowers a duty of care unless their involvement in the loan transaction exceeds the scope of their "conventional role as a mere lender of money." *See Nymark v. Heart Fed. Savings & Loan Ass'n*, 231 Cal. App. 3d 1089, 1095–96 (1991) (citations omitted). To determine "whether a financial institution owes a duty of care to a borrower-client," courts must balance the following non-exhaustive factors:

---

[98] Complaint — ECF No. 1-1, ¶¶ 224-27.

> [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.

*Id.* at 1098 (quotation marks and citations omitted); *see Rowland v. JPMorgan Chase Bank, N.A.*, No. C 14-00036 LB, 2014 WL 992005, at *8–9 (N.D. Cal. Mar. 12, 2014); *Ansanelli v. JP Morgan Chase Bank, N.A.*, No. C 10-03892 WHA, 2011 WL 1134451, at *7 (N.D. Cal. Mar. 28, 2011).

The plaintiffs plausibly allege a negligence claim. Courts in this district have concluded — in the face of authority that goes in both directions — that a financial institution that accepts a loan-modification application has exceeded its role as a money lender and is subject to a standard of reasonable care in handling the application. *See Rijhwani*, 2014 WL 890016, at *15-16 (collecting and analyzing cases). The defendants' discussion of the economic-loss doctrine does not change this outcome.[99] The plaintiffs plausibly allege a separate tort beyond a broken contractual promise. *See Robinson Helicopter Co. v. Dana Corp.,* 34 Cal. 4th 979, 988 (2004) (quoted in *Frye v. Wine Library, Inc.*, 2006 WL 3500605, *2 (N.D. Cal. Dec. 4, 2006)).

### 3. Intentional and Negligent Misrepresentation

The plaintiffs allege that the servicers intentionally misrepresented the status of the loan modification to keep the plaintiffs in a modification process that they never intended to complete.[100] Alternatively, the plaintiffs assert, the servicers' misrepresentations were negligent.[101]

"The elements of intentional misrepresentation, or actual fraud, are: '(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage.'" *Anderson v. Deloitte & Touche*, 56 Cal. App. 4th 1468, 1474 (Cal. Ct. App. 1997) (quoting *Molko v. Holy Spirit Ass'n*, 46 Cal. 3d 1092, 1108 (Cal. 1988)); *see also* Cal. Civ. Code § 1572. "The general

---

[99] Motion — ECF No. 8 at 22-23.

[100] Complaint — ECF No. 1-1, ¶¶ 204-09.

[101] *Id.* ¶¶ 210-11.

rule for liability for non-disclosure is that even if material facts are known to one party and not the other, failure to disclose those facts is not actionable fraud unless there is some fiduciary or confidential relationship giving rise to a duty to disclose." *La Jolla Village Homeowners' Ass'n v. Superior Court*, 212 Cal. App. 3d 1131, 1151 (Cal. Ct. App. 1989), disapproved on other grounds by *Jimenez v. Superior Court*, 29 Cal. 4th 473, 479-80 (Cal. 2002).

Rule 9(b) provides: "In alleging fraud . . ., a party must state with particularity the circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This means that "[a]verments of fraud must be accompanied by the 'who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003). "'A plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false.'" *Id.* (quoting *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 42 F.3d 1541, 1548 (9th Cir. 1994) (italics in original)). Like the basic "notice pleading" demands of Rule 8, a driving concern of Rule 9(b) is that defendants be given fair notice of the charges against them. *See, e.g., In re Lui*, 2016 WL 1212113, *1 (9th Cir. Mar. 29, 2016) ("Rule 9(b) demands that allegations of fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.") (quotation omitted); *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (Rule 9(b) requires particularity "so that the defendant can prepare an adequate answer").

To state a claim for negligent misrepresentation, a plaintiff must allege the following: "1) a representation as to a material fact; 2) that the representation is untrue; 3) that the defendant made the representation without a reasonable ground for believing it true; 4) an intent to induce reliance; 5) justifiable reliance by the plaintiff who does not know that the representation is false; and, 6) damage." *Bear Stearns & Co. v. Daisy Sys. Corp.*, 97 F.3d 1171, 1180 (9th Cir. 1996) (citing *Masters v. San Bernardino County Employees Retirement Ass'n*, 32 Cal. App. 4th 30, 40 n.6 (1995)). As with intentional misrepresentation, the existence of a duty of care is necessary to support a negligent misrepresentation claim. *Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511,

1523 (N.D. Cal. 1990) ("Liability for negligent misrepresentation may attach only where plaintiff establishes that defendants breached a duty owed to him"); *Garcia v. Superior Court*, 50 Cal. 3d 728, 735 (1990).

The plaintiffs have not plausibly pleaded an intentional misrepresentation or intent to defraud. The complaint perhaps alleges incompetence by the loan servicers but it does not amount to fraud. For similar reasons, the plaintiffs have not plausibly alleged a claim for negligent misrepresentation either. Again, the complaint does not plausibly allege untrue misrepresentations or the plaintiffs' reliance on them. Instead, the plaintiffs' claims are more plausibly couched as contract-based or negligence claims.

### 4. HBOR — Cal. Civil Code § 2924.11

California Civil Code § 2924.11 requires a subsequent servicer to honor a previous servicer's written approval of a first-lien modification or other foreclosure-prevention alternative. More specifically, section 2924.11(b)(g) provides:

> [I]f a borrower has been approved in writing for a first lien modification or other foreclosure prevention alternative, and the servicing of borrower's loan is transferred or sold to another mortgage servicer, the subsequent mortgage servicer shall continue to honor any previously approved first lien loan modification or other foreclosure prevention alternative, in accordance with the provisions of the act that added this section.

The defendants argue that there is no final modification agreement in writing because the plaintiffs did not make their three trial payments at the beginning of the month.[102] The court rejected this argument when it analyzed the contract claim.

### 5. HBOR — Single Point of Contact under Cal. Civil Code § 2923.7

In their seventh claim, the plaintiffs allege a violation of California Civil Code § 2923.7.[103] They acknowledge that BSI assigned a single point of contact, but they were forced to

---

[102] Motion — ECF No. 8 at 23.

[103] Complaint — ECF No. 1-1, ¶ 242.

ORDER — No. 16-cv-03478-LB        17

communicate with multiple points of contact "within a matter of months" and no one was able to provide the information required by section 2923.7.[104]

Section 2923.7 provides that, when a borrower requests a foreclosure-prevention alternative, such as a loan modification, the servicer must promptly designate a "single point of contact" ("SPOC") to communicate directly with the borrower. Cal. Civ. Code § 2923.7(a). The SPOC can be an individual or a team, but must (among other things) possess sufficient knowledge about foreclosure alternatives and have access to individuals who have the ability and authority to stop foreclosure proceedings. *See id.* §§ 2923.7(b)-(d).[105] Moreover, "[t]he mortgage servicer shall ensure that each member of the [SPOC] team is knowledgeable about the borrower's situation and current status in the alternatives to foreclosure process." *Id.* § 2923.7(e).

The defendants argue that Venture Trust never serviced the loan and thus the plaintiffs cannot establish a claim against Venture. Claim seven does not discuss Venture Trust at all. Neither do the plaintiffs in their opposition. The court dismisses the claim.

BSI also assets that it did establish a single point of contact and that nothing in section 2923.7 prohibits a servicer from assigning more than one single point of contact to a borrower over a period of time.[106] But as the defendants recognize, the "single point of contact" can be an

---

[104] *Id.*

[105] The SPOC is responsible for the following:

   (1) Communicating the process by which a borrower may apply for an available foreclosure prevention alternative and the deadline for any required submissions to be considered for these options.

   (2) Coordinating receipt of all documents associated with available foreclosure prevention alternatives and notifying the borrower of any missing documents necessary to complete the application.

   (3) Having access to current information and personnel sufficient to timely, accurately, and adequately inform the borrower of the current status of the foreclosure prevention alternative.

   (4) Ensuring that a borrower is considered for all foreclosure prevention alternatives offered by, or through, the mortgage servicer, if any.

   (5) Having access to individuals with the ability and authority to stop foreclosure proceedings when necessary.

Cal. Civ. Code § 2923.7(b).

[106] Motion — ECF No. 8 at 24.

individual or a team, but it must possess sufficient knowledge about foreclosure alternatives and have access to individuals who have the ability and authority to stop foreclosure proceedings. *Id.* § 2023.7(b) & (e).[107] The plaintiffs sufficiently alleged a violation as to BSI.

### 6. California Business & Professions Code § 17200 (Unfair Competition Law) Claim

To the extent that the UCL claim is predicated on the unlawful prong, it survives.

### 7. Intentional Infliction of Emotional Distress

The plaintiffs allege that the defendants' conduct was extreme and outrageous, and they thus assert a claim for intentional infliction of emotional distress.[108]

"Under California law, the elements of an IIED claim are: (1) extreme and outrageous conduct by the defendants with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendants' outrageous conduct." *Anderson v. Louden, LLC*, No. C 13-04159 WHA, 2013 WL 6405825, at *4 (N.D. Cal. Dec. 6, 2013) (citing *Cervantez v. J.C. Penny Co.*, 24 Cal. 3d 579, 593 (1979)).

The court does not think that the plaintiffs plausibly pleaded outrageous conduct by the defendants to intentionally or recklessly cause severe emotional distress. That is not to say that the plaintiffs were not distressed. Surely they were. But the complaint does not plausibly allege that the defendants acted intentionally or recklessly.

### 8. Declaratory Relief

In claim eleven, the plaintiffs challenge the securitization of their loan.[109] The defendants argue that the plaintiffs lack standing to assert claims based on defects in the securitization

---

[107] Motion — ECF No. 8 at 24.

[108] Complaint — ECF No. 1-1, ¶¶ 254-57.

[109] *Id.* ¶¶ 261-68.

ORDER — No. 16-cv-03478-LB           19

process.[110] The court agrees.

Courts in this district conclude that plaintiffs lack standing to challenge noncompliance with a pooling and service agreement ("PSA") in securitization unless they are parties to the PSA or third-party beneficiaries of it. *See Khan v. ReconTrust Co.*, 81 F. Supp. 3d 867, 872-73 (N.D. Cal. Feb. 23, 2015) (collecting and analyzing cases). The plaintiffs urge the court to follow *Glaski v. Bank of America, N.A.*, 218 Cal. App. 4th 1079, 1095 (2013). There, the court found that the note was assigned to a securitized trust after the trust closed and thus conferred standing. *Id.* at 1097. Courts in this district have found *Glaski* unpersuasive and do not follow it. *See Khan*, 81 F. Supp. 3d at 872-73.

## CONCLUSION

The court dismisses claims one and two (intentional and negligent misrepresentation), claim eight (the Cal. Civil Code § 2923.7 violation) against Venture Trust (on the ground that it is not a servicer), claim nine (the UCL claim) to the extent that it is predicated on dismissed claims, claim ten (intentional infliction of emotional distress), and claim eleven (declaratory relief based on improper securitization). The court otherwise denies the defendants' motion to dismiss.

The dismissal of the securitization claim is with prejudice because the court reaches its conclusion as a matter of law. The dismissal of the other claims is without prejudice. The plaintiffs may amend their complaint within 14 days, although the court thinks that the existing claims capture the alleged harm fully.

The court grants the defendants' motion to take judicial notice of public records.[111]

This disposes of ECF No. 8.

**IT IS SO ORDERED.**

Dated: October 24, 2016

_____
LAUREL BEELER
United States Magistrate Judge

---

[110] Motion — ECF No. 8 at 27.
[111] Request — ECF No. 9.